## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JONATHAN FISHER, | : | CIVIL ACTION |
| Petitioner | : | |
| | : | |
| v. | : | NO. 02-1764 |
| | : | |
| JEFFREY BEARD, et al., | : | |
| Respondents | : | |

## REPORT AND RECOMMENDATION

**TIMOTHY R. RICE**                                              **September 6, 2007**
**U.S. MAGISTRATE JUDGE**

Petitioner Jonathan Fisher, a prisoner at the State Correctional Institution at Greene in

Waynesburg, Pennsylvania, has filed a counseled petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254.  For the following reasons, I respectfully recommend his petition be denied

with prejudice because his claims are without merit.

## FACTUAL AND PROCEDURAL HISTORY

On November 12, 1999, after a jury trial in the Court of Common Pleas of Montgomery

County, Fisher was convicted of first-degree murder, burglary, robbery, aggravated assault, and

possession of an instrument of crime.  Following the penalty phase, on November 15, 1999,

Fisher was sentenced to death.  Fisher's conviction and sentence were affirmed by the Supreme

Court of Pennsylvania on April 18, 2001.  See Commonwealth v. Fisher, 769 A.2d 1116 (Pa.

2001).  On March 4, 2002, the United States Supreme Court denied Fisher's petition for a writ of

certiorari.  See Fisher v. Pennsylvania, 535 U.S. 906 (2002).

On April 1, 2002, Fisher filed a motion in this court for a stay of execution pursuant to 28

U.S.C. § 2251 and McFarland v. Scott, 512 U.S. 849 (1994).  The Honorable Jay C. Waldman

granted a stay of execution on June 13, 2002.  On February 21, 2003, Fisher filed his federal

petition for a writ of habeas corpus and a petition to hold his federal proceedings in abeyance

while he completed his state post-conviction challenge.  On May 22, 2003, the Honorable Bruce

W. Kauffman granted Fisher's motion to stay the proceedings.

On February 25, 2003, Fisher filed a petition for habeas corpus relief under Article I,

Section 14 of the Pennsylvania Constitution and for statutory relief under the Post Conviction

Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. § 9541 et seq.  A hearing on Fisher's PCRA

petition was held on August 6, 2004.  At the hearing, the Commonwealth conceded that Fisher's

trial counsel was ineffective during the penalty phase, and that Fisher had the right to a new

sentencing hearing.  Fisher was then re-sentenced to life imprisonment after the Commonwealth

did not seek the death penalty on re-sentencing.[1]  The parties then litigated three issues

challenging trial counsel's performance during the guilt phase of trial.

On August 12, 2004, the PCRA court denied Fisher's petition.  Fisher's appeal was

denied by the Pennsylvania Superior Court on June 14, 2005.  See Commonwealth v. Fisher, No.

2680 EDA 2004 (Pa. Super. June 14, 2005).  The Pennsylvania Supreme Court denied Fisher's

petition for allowance of appeal on December 8, 2005.  See Commonwealth v. Fisher, 889 A.2d

1213 (Pa. 2005) (table).

Fisher's federal petition was removed from civil suspense on February 23, 2006.  On May

22, 2006, Fisher filed his memorandum of law in support of his petition alleging: (1) trial counsel

was ineffective by failing to provide evidence promised during his opening statement, conceding

Fisher's guilt during closing argument, and putting forth argument based on a fundamental

misunderstanding of the law; (2) trial counsel was ineffective for failing to investigate and

---

[1] Although Fisher's brief suggests heightened standards apply to capital cases, Fisher's case is no longer a capital case.  Because the "death is different" jurisprudence and the requisite heightened standards are premised on the finality of the punishment, see Beck v. Alabama, 447 U.S. 625, 637-38 (1980), and Fisher is no longer facing a death sentence, the heightened requirements are inapplicable.

present readily available impeachment evidence, including convictions involving dishonesty against key Commonwealth witnesses, and the Commonwealth violated Brady v. Maryland, 373 U.S. 83 (1963) by failing to turn over impeachment evidence concerning Matthew Burse and Derrick Thomas; and (3) Fisher's Sixth, Eighth, and Fourteenth Amendment rights were violated by pervasive prosecutorial misconduct.

## **DISCUSSION**

I.  Exhaustion and procedural default

With the exception of Fisher's claim alleging ineffective assistance of counsel regarding the lack of a diminished capacity defense, Fisher's federal claims are exhausted because Fisher raised his federal claims in PCRA court and in the Superior Court during his appeal of the denial of his PCRA petition.  O'Sullivan v. Boerkel, 526 U.S. 838, 839 (1999); Picard v. Connor, 404 U.S. 270, 275 (1971); Slutzker v. Johnson, 393 F.3d 373, 379 (3d Cir. 2004).  Moreover, Fisher's claims are not procedurally defaulted, and therefore are ripe for federal review.

"A state ordinarily is required to assert a procedural default in its answer if it intends to rely on that defense."  Szuchon v. Lehman, 273 F.3d 299, 321 (3d Cir. 2001).  The Commonwealth does not assert that any of Fisher's claims are either unexhausted or procedurally defaulted.  However, this Court has discretion to raise the issue sua sponte.  See Sweger v. Chesney, 294 F.3d 506, 520-21 (3d Cir. 2002); 28 U.S.C. § 2254(b)(3) ("State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.").

The Pennsylvania Superior Court found Fisher's ineffective assistance of counsel claims to be waived because they were not properly pleaded as "layered" claims.  See Fisher, No. 2680 EDA 2004, slip op. at 6-9.  Specifically, the Superior Court found Fisher's claims regarding

appellate counsel's ineffectiveness on direct appeal were boilerplate.  See id.  Moreover, the court found the underlying claims of trial counsel ineffectiveness were not of arguable merit to warrant remand to allow Fisher to amend his petition to properly assert appellate counsel's ineffectiveness during direct appeal for failure to raise trial counsel's ineffectiveness.  See id. at 10-22.

Fisher's ineffectiveness claims are not procedurally barred by the Superior Court's waiver finding because the finding was not an "independent and adequate" state rule as applied to Fisher.  To be an "independent and adequate" rule: (1) the rule must speak in unmistakable terms; (2) all state appellate courts must have refused to reach the merits of the claim; and (3) the state's refusal in Fisher's case must be consistent with other decisions.  Doctor v. Walters, 96 F.3d 675, 683-84 (3d Cir. 1996).  Moreover, "if the decision . . . fairly appeared to rest primarily on resolution of [the federal] claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition."  Coleman v. Thompson, 501 U.S. 722, 735 (1991); see also Harris v. Reed, 489 U.S. 255 (1989) (state decision was not independent where it mentioned waiver rule but then determined federal claims were without merit).  A "state procedural rule is not independent when it substantially mirrors the requirements of federal constitutional law."  Morris v. Beard, 2007 WL 1795689 at *11 (E.D. Pa. June 20, 2007) (Rodriguez, J.) (citing Bronstein v. Horn, 404 F.3d 700, 722 (3d Cir. 2005)).

Here, the Superior Court applied a Pennsylvania procedural rule to find Fisher's claims waived.  The court's procedural finding, however, was interwoven with an examination of the "arguable merit" of Fisher's federal claims.  After finding Fisher's pleadings ran afoul of Pennsylvania's "layering" requirements, the court explained "our inquiry does not end here."

Fisher, No. 2680 EDA 2004, slip op. at 10.  The court then examined Fisher's claims using a test

mirroring Strickland v. Washington, 466 U.S. 668 (1984), i.e., the court examined whether trial

counsel's performance was deficient, and whether the deficiencies prejudiced Fisher, to

determine whether Fisher could amend his PCRA petition to satisfy Pennsylvania's pleading

requirements.  Because the Superior Court relied on the merits of Fisher's claims in declining to

remand Fisher's petition to allow amendment, which was not couched as an alternative holding,

and the court's decision did not clearly and explicitly rest on state law, the decision was not

independent of federal law.  See, e.g., Ford v. Stepanik, 1998 WL 297626 at *4 (E.D. Pa. June 2,

1998) (DuBois, J.) (state waiver rule not independent of federal law when rule requires state to

look to federal habeas principles).  Thus, Fisher's claims are reviewable.  Cf. Holiday v. Varner,

176 Fed. Appx. 284, 287-88 (3d Cir. 2006) (at the time petitioner filed his PCRA petition

Pennsylvania did not have a clearly established procedural rule for pleading a layered

ineffectiveness claim; Pennsylvania did not make such requirements clear until September, 2003

[Fisher's PCRA petition was filed in February, 2003]); but see Sistrunk v. Vaughn, 96 F.3d 666,

674-75 (3d Cir. 1996) (state procedural bar precluded federal habeas review of claim A even

where state court evaluated the merits of claim A in determining the merits of claim B, which

was an ineffective assistance of counsel claim for failure to raise claim A).

However, Fisher's claim that counsel was ineffective for failing to investigate and present

a diminished capacity defense - - which is not set out in Fisher's memorandum as a separate

claim, but is included in his prejudice analysis, see Pet'r's Mem. at 18-21 - - was not properly

exhausted, and is now procedurally defaulted.  Applying an independent and adequate state

procedural rule, the Superior Court found Fisher's claim waived because it was not presented in

Fisher's PCRA petition.  Fisher, No. 2680 EDA 2004, slip op. at 17 (citing Commonwealth v.

Brown, 767 A.2d 576, 585 (Pa. Super. 2001)).  Unlike Fisher's other ineffective assistance of counsel claims, the Superior Court did not evaluate the arguable merit of Fisher's ineffective assistance of counsel claim regarding a diminished capacity defense.  See id.  As a result of Fisher's failure to give the state courts an opportunity to evaluate the merits of his claim through proper presentation of the claim, Fisher's federal claim is procedurally defaulted and not subject to review.  See Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Lambrix v. Singletary, 520 U.S. 518, 522 (1997); Coleman v. Thompson, 501 U.S. 722, 729 (1991); Harris v. Reed, 489 U.S. 255, 261-62 (1989).

Fisher's procedurally defaulted claim is unreviewable unless he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrate that failure to consider the claim would result in a fundamental miscarriage of justice."  Coleman, 501 U.S. at 750.

To show cause, Fisher must show "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  Id. at 753; Murray v. Carrier, 477 U.S. 478, 488 (1987); Sistrunk v. Vaughn, 96 F.3d 666, 675 (3d Cir. 1996).  To establish the requisite fundamental miscarriage of justice, Fisher must demonstrate "actual innocence," Schlup v. Delo, 513 U.S. 298, 324 (1995), i.e., "new reliable evidence," such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," id.; Hubbard v. Pinchak, 378 F.3d 333, 339 (3d Cir. 2004) (addressing claim of actual innocence but rejecting it on the merits), that would make it more likely than not that "no juror, acting reasonably, would have voted to find [petitioner] guilty beyond a reasonable doubt."  See Schlup, 513 U.S. at 329; House v. Bell, 126 S. Ct. 2064, 2076-77 (2006).

Fisher cannot meet this heavy burden.  Fisher does not present any new reliable evidence of innocence to show a miscarriage of justice would result if his default is not excused. Likewise, Fisher does not allege any external factor prevented him from raising this claim in the state courts.

II.    Standard of review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), I cannot grant federal habeas relief for any claim adjudicated on the merits in state court proceedings, unless I determine that the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d)(1)-(2).[2]  I must presume that the state court's findings of fact are correct and petitioner must rebut that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

---

[2] The plain language of 28 U.S.C. § 2254(d)(1) does not limit AEDPA deference to decisions of the highest state court.  Although the United States Court of Appeals for the Third Circuit has not specifically addressed this point, it has recognized the propriety of applying AEDPA deference to a state post-conviction court decision on the merits.  See generally Nara v. Frank, 488 F.3d 187, 201 (3d Cir. 2007) (observing PCRA court's ruling, even though reversed on appeal, was an "adjudication on the merits"); Wright v. Varner, 473 F.3d 85, 90 (3d Cir. 2006) (assuming AEDPA deference applies to PCRA court decisions and denying prisoner relief); Holliday v. Varner, 176 Fed.Appx. 284, 288 (3d Cir. 2006) (applying AEDPA deference to PCRA court decision where Superior Court waiver ruling was inadequate); see also Rollins v. Horn, 2006 WL 2504307 at *1 (E.D. Pa. Aug. 17, 2006) (Joyner, J.) (applying AEDPA deference to PCRA court decision); Fahy v. Horn, 2003 WL 22017231 (E.D. Pa. Aug. 26, 2003) (Shapiro, J.) (same).

A state court ruling is "contrary to" clearly established Supreme Court precedent for the purposes of § 2254(d)(1) "if the state court applies a rule that contradicts the governing law" set forth in Supreme Court cases, or "if the state court confronts a set of facts that are materially indistinguishable from" a Supreme Court decision and nevertheless arrives at a result different from its precedent. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). In determining whether a state court's decision was contrary to Supreme Court precedent, state court decisions should be "given the benefit of the doubt." Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam). It is not necessary that the state court cite, or even be aware of, the governing Supreme Court precedent. Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam). All that is required is a showing that "neither the reasoning nor the result of the state-court decision contradicts" Supreme Court precedent. Id.

A state court decision constitutes an "unreasonable application" of Supreme Court precedent if it identifies the correct governing legal rule from Supreme Court cases, but "unreasonably applies it to the facts of the particular state prisoner's case." Williams, 529 U.S. at 407. For this inquiry, I must determine "whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409; see also Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 891 (3d Cir. 1999) (en banc) (determining whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under Supreme Court precedent). A showing of clear error is not sufficient. Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). Decisions of lower federal courts may be helpful in ascertaining the reasonableness of state courts' application of clearly established Supreme Court precedent. Fischetti v. Johnson, 384 F.3d 140, 149 (3d Cir. 2004). I

may not grant habeas relief merely because the state court applied federal law erroneously or incorrectly.[3]  Thomas v. Varner, 428 F.3d 491, 497 (3d Cir. 2005).

III.    Fisher's federal claims

A.    Ineffective assistance of trial counsel

Clearly established Supreme Court law governing ineffectiveness claims is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  Bell v. Cone, 535 U.S. 685, 698 (2002). Strickland sets forth a two-prong test:  (1) whether counsel's performance was deficient, i.e., he made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment; and (2) whether the deficient performance prejudiced the defense, i.e., the errors were so serious as to deprive the defendant of a fair trial.  Strickland, 466 U.S. at 687; see

---

[3] The AEDPA deferential standard of review does not apply "unless it is clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States." Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005) (quoting Everett v. Beard, 290 F.3d 500, 508 (3d Cir.2002)).  "If it is not clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined under United States Supreme Court law," federal habeas courts undertake a pre-AEDPA de novo review of the claims.  Morris v. Beard, 2007 WL 1795689 (E.D. Pa. June 20, 2007) (Rodriguez, J.) (citing Jacobs, 395 F.3d at 100; Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001)).  The effect given to state court factual findings remains unchanged.  Jacobs, 395 F.3d at 100.

The Superior Court's treatment of Fisher's ineffective assistance claims involved an exploration of the merits of Fisher's federal claims in the procedural context.  Although this presents a close question, I find the AEDPA's deferential standard applies because the Superior Court's decision reached the merits of the federal claim.  See Jimenez v. Walker, 458 F.3d 130 (2d Cir. 2006).  In Jimenez, the Second Circuit found no gray area exists in a situation similar to Fisher's situation: either (1) the state decision rested on, or was interwoven with, federal law, and the claim was thus adjudicated on the merits, or (2) the state decision rested on state procedure, and the claim was thus procedurally defaulted.  Id. at 145-46.  Where the former is true, AEDPA deference applies.  Id.  Because I found Fisher's claims subject to federal habeas review based on the state court's decision that was interwoven with federal substantive law, i.e., the merits of Fisher's claims, the Superior Court's decision is subject to AEDPA deference.  Moreover, neither Fisher nor the respondents contend Fisher's claims are subject to de novo review; each party's brief assumes AEDPA deference applies.

generally Outten v. Kearney, 464 F.3d 401, 413-14 (3d Cir. 2006); Thomas, 428 F.3d at 499. "Unless a defendant makes both showings, it cannot be said that the conviction or sentence resulted from a breakdown in the adversary process that renders the result unreliable." Strickland, 466 U.S. at 687.  A materially identical standard is used by Pennsylvania courts.[4] Werts v. Vaughn, 228 F.3d 178, 204 (3d Cir. 2000) (Pennsylvania standard is "not contrary to" the Strickland standard); Commonwealth v. Pierce, 527 A.2d 973, 976 (Pa. 1987) (Pennsylvania standard and Strickland standard "constitute the same rule").

Counsel's effectiveness is measured objectively considering all the circumstances. Strickland, 466 U.S. at 687-88.  To establish counsel's performance was deficient, Fisher must show "counsel's representation fell below an objective standard of reasonableness."  Id. at 688. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Id. at 689; see Douglas v. Cathel, 456 F.3d 403, 420 (3d Cir. 2006).  Counsel's conduct is presumed to fall within the wide range of reasonable professional assistance.  Strickland, 466 U.S. at 689.  The strategic decisions of counsel, made after thorough investigation of law and facts, are virtually unchallengeable.  Id. at 690.

To satisfy Strickland's prejudice requirement, Fisher must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in

---

[4] To succeed on an ineffective assistance of counsel claim in Pennsylvania, an appellant must establish:  (1) that the underlying claim is of arguable merit; (2) that counsel's course of conduct was without a reasonable basis designed to effectuate his client's interest; and (3) that he was prejudiced by counsel's ineffectiveness.  Commonwealth v. Wallace, 724 A.2d 916, 921 (Pa. 1999).

the outcome." Shelton v. Carroll, 464 F.3d 423, 440 (3d Cir. 2006) (quoting Strickland, 466 U.S. at 694). Moreover, "[t]he effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial; 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" Rolan v. Vaughn, 445 F.3d 671, 682 (3d Cir. 2006) (quoting United States v. Gray, 878 F.2d 702, 710-11 (3d Cir. 1989)). In contrast, counsel's errors are unlikely to undermine the confidence in a verdict supported by overwhelming evidence. See, e.g., Albrecht v. Horn, 485 F.3d 103, 128-29 (3d Cir. 2007).

In evaluating trial counsel's performance, I must be "highly deferential" and "indulge a strong presumption" that counsel's challenged actions might be considered sound strategy under the circumstances. See Thomas, 428 F.3d at 499 n.6 (citing Buehl v. Vaughn, 166 F.3d 163, 169 (3d Cir. 1999)). The relevant inquiry is not whether Fisher's counsel was prudent, appropriate, or perfect. Rather, the focus is simply to ensure that Fisher received a fair trial. See Marshall v. Hendricks, 307 F.3d 36, 91 (3d Cir. 2002). Moreover, review of ineffectiveness claims is "doubly deferential when it is conducted through the lens of federal habeas." Yarborough v. Gentry, 540 U.S. 1, 6 (2003). Fisher must show the state court's decision was objectively unreasonable. Woodford, 537 U.S. at 25. It is not enough to convince a federal habeas court that, in its independent judgment, the state court erred in applying Strickland. Bell, 535 U.S. at 698-99. Fisher, therefore, must do more than show he would have satisfied Strickland if his claims were being analyzed here in the first instance.

 

1.    Trial counsel's representations during opening statement regarding defenses

Fisher claims trial counsel was ineffective in his proffer of three defenses during opening statement: (1) reasonable doubt; (2) the appropriateness of the criminal charges of third-degree murder, voluntary manslaughter, and conspiracy to the facts of the case; and (3) credibility. Fisher contends trial counsel emphasized an improper definition of reasonable doubt, offered a defense that another person may have been involved in the crime - - his conspiracy argument - - that was wholly unsupported by the evidence, and did not properly investigate any of the proffered defenses.  Moreover, Fisher alleges trial counsel lost credibility with the jury when he admitted "miss[ing] the boat" on the charges of conspiracy and voluntary manslaughter.  Fisher's claim is without merit.

Fisher contends trial counsel erred in giving the following description of reasonable doubt:

> As we proceed, I suggest that you will have a doubt, a considerable doubt.  Why? Well, for several reasons, but most importantly, however, is this: Obviously none of you were there when this incident took place.  You will, therefore, have to make a judgment based upon what others are telling you about what happened. So the first premise is this: If you didn't see it for yourself you can't be a hundred percent certain. . . .  Out of all the people you will hear from in this trial, out of all of the people you will hear from, no one, no one is sure how the death of Quintin Neal actually occurred.  Nobody.  Therefore, not only will you be called upon to make a judgment on what happened at an event in which you were not present, but in addition, you will have to make that judgment based on what strangers are telling you and when none of those people can explain to you clearly how it occurred.  The result, a doubt.  A reasonable doubt.

N.T. 11/8/99 at 37-39.

The Superior Court found trial counsel's definition of reasonable doubt was consistent with Pennsylvania law.  Fisher, No. 2680 EDA 2004, slip op. at 11-12 (citing Commonwealth v. Young, 317 A.2d 258 (1974)).  The court found counsel then merely stated a "truism" that if a juror did not personally witness an event the juror will logically have some doubt, and that even if counsel's statements concerning reasonable doubt were not accurate, the inaccuracy erred on

the side of aiding Fisher, and the trial court's correct instruction to the jury cured any potential

confusion. Id. at 12.

Fisher also argues trial counsel erred where he encouraged the jury to consider the charge

of conspiracy:

> First I suggest to you that theory, John Fisher acting alone, was established within
> moments after the incident, and all subsequent investigation by the police officers,
> the detectives and the law enforcement authorities focused solely on the one-man
> theory.

> Secondly, that theory that only one person was involved was established, and any
> credible information or worthy lead obtained regarding other potential suspects
> were either ignored or given half-hearted follow-ups. . . .  As we proceed, consider
> the likely possibility that others were involved.

N.T. 11/8/99 at 44-45.  Fisher correctly notes that no evidence of another person's involvement

was introduced at trial, and that trial counsel hired an investigator only three days before the trial

for the purpose of investigating mitigating factors for the penalty phase of trial.  During closing

argument, Fisher's trial counsel admitted the evidence did not support the defenses of voluntary

manslaughter[5] and conspiracy:

> Now, that being said, I suggest to you that I missed the boat on one of those
> issues.  I was wrong on the issue of voluntary manslaughter and criminal
> conspiracy.  We all heard testimony, and we all saw the evidence.  It is not
> reasonable for me to stand before you this morning and argue about conspiracy or
> the involvement of other as accomplices.  The evidence does not bear that out.

N.T. 11/12/99 at 884-85.  Counsel, however, continued to argue that reasonable doubt and

credibility were still at issue.  Id. at 885.

The Superior Court found that trial counsel questioned only one detective during trial

about the possibility of another person being involved with the shooting and did not examine the

---

[5] To the extent Fisher contends he was left defenseless by counsel's concession of being
incorrect about voluntary manslaughter, the claim is evaluated later.

theory any further.  Fisher, No. 2680 EDA 2004, slip op. at 14.  The court found Fisher's counsel was deficient because he lost some credibility with the jury when he was forced to withdraw the argument based on his failure to develop the record.  Id. at 15.  Based on the "deluge" of evidence, however, the Superior Court found that any slight prejudice Fisher suffered was harmless error.[6]  Id. (citing Commonwealth v. Laich, 777 A.2d 1057, 1062-63 (Pa. 2001)).

The Superior Court's decisions regarding trial counsel's definition of reasonable doubt and his loss of credibility through his argument on conspiracy were neither contrary to, nor unreasonable applications of Strickland.  Thus, Fisher's claim fails.

First, the Superior Court's decision rejecting Fisher's contention concerning trial counsel's definition of reasonable doubt was not objectively unreasonable.  See Williams, 529 U.S. at 409.  Trial counsel's performance was not deficient where he correctly defined reasonable doubt for the jury.  Moreover, counsel's truism that the jury could not be completely sure of an event if they did not witness the event served only to further explain the standard.  Counsel's decision to explain reasonable doubt should not be second-guessed here.  When viewed in its entirety, counsel's statement correctly defined reasonable doubt and gave an example of doubt. Counsel then explained that the doubt becomes reasonable doubt when the jury considers that the witnesses could not clearly explain what occurred that night.  Thus, the state court reasonably concluded counsel's explanation was not so below professional norms as to be deficient under Strickland.

---

[6] The harmless error standard in Laich, 777 A.2d at 1062-63, i.e., there is no reasonable probability the error contributed to the verdict, mirrors the federal harmless error standard in Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), which is essentially the same standard as Strickland prejudice, see Whitney v. Horn, 280 F.3d 240, 258-59 & n.18 (3d Cir. 2002).  Thus, the Superior Court's decision based on harmless error will be evaluated as if it were denied based on a failure to meet Strickland's prejudice prong.

Second, the Superior Court's decision rejecting Fisher's claim regarding trial counsel's conspiracy argument was not objectively unreasonable.  Although counsel's argument, and his failure to support the argument, may have led to lost credibility with the jury, Fisher cannot show this error undermined the reliability of his verdict, or that there is a reasonable probability that the outcome of his trial would have been different without the error.  The Superior Court aptly noted that a "deluge" of evidence supported Fisher's conviction.  The Pennsylvania Supreme Court, during its review for sufficient evidence, summarized the evidence as follows:

> In the early morning hours of July 18, 1998, Rico Gonzalez was drinking a beer in his apartment in Norristown, Montgomery County, when he heard someone knocking on the main door to the apartment building. He left his apartment, opened the main door to the rooming house, and was knocked to the ground as [Fisher] rushed past him with a .22 caliber rifle. [Fisher] ran to the top of the main staircase, where he encountered Annalisa Wodarski and asked her for the location of persons whom he did not name. When she failed to answer, [Fisher] approached a door at the end of the hallway, opened it quietly, and peered inside. Wodarski then witnessed [Fisher] cock his rifle and enter the room, before she ran down the stairs and out of the building.
>
> [Fisher] entered the room of Quentin Neal and Matthew Burse, which the two used as their principal place of business for their drug-dealing operations. Upon finding Neal asleep in a reclining chair, [Fisher] fired three shots at close range into Neal's chest. The gunshots awakened Burse, who was lying in a bed just a few feet away from Neal. Burse saw [Fisher] standing in front of Neal with the rifle pointed at Neal's chest. [Fisher] then turned to Burse, asking him for money. When Burse said that he did not have any money to give him, [Fisher] shot Burse in the shoulder and repeated the demand. Burse then produced sixty dollars; [Fisher] took the cash and fled the room. Burse raced after [Fisher], attacked him, and wrestled the gun away from him, but [Fisher] was able to flee the scene.
>
> A woman, who identified herself only as Colleen, telephoned the local emergency response number to report the shooting at 4:17 a.m. She described the gunman as a light-skinned African American male with freckles, who was approximately six feet tall, a description consistent with [Fisher's] appearance. The paramedics arrived shortly thereafter and transported Neal to the hospital by helicopter. He was pronounced dead at 5:20 a.m. A subsequent autopsy revealed that Neal died when one of the bullets pierced his heart. At the scene, Burse, who appeared to police officers to be somewhat confused and shaken, stated that a man, whom he described as a six-foot-tall, light-skinned African-American male with freckles, had first shot him and then murdered Neal. Burse was taken to the hospital and

treated for a gunshot wound to his shoulder. After he received treatment, Burse was again questioned by an officer, at which time he explained that [Fisher] had fired upon Neal before he, Burse, had been injured.

Meanwhile, [Fisher] had fled to the home of his stepmother, arriving there shortly before 5:00 a.m. He informed her and his stepbrother that he had just shot someone using the stepbrother's gun, that the police were looking for him, and that he had to get away. [Fisher] next called his girlfriend, Nyquallah Bey, telling her he was coming by her residence to retrieve some clothing. He then telephoned Genoa Tillman, the mother of one of his children, to ask for a ride. Tillman drove [Fisher] from his stepmother's house to his girlfriend's residence, where he retrieved his clothing, and then to Tillman's home, where she allowed him to remain for a few days. Fearing apprehension, [Fisher] eventually fled to New Jersey.

On May 11, 1999, nearly ten months after the shooting, federal agents arrested [Fisher] at 3:20 p.m. on a fugitive warrant in Newark, New Jersey, where he was living under the assumed name of Rellie Chambers. During transport to the holding facility, without prompting from law enforcement officials, [Fisher] made several statements, including, "I'm glad it's over," "I was tired of looking over my shoulder," "I want to talk to someone about this," and "How did you find me?" [Fisher] also asked if he could return to Pennsylvania to "get this over with." The officers responded only by stating that [Fisher] would have to wait to speak with the detective in charge at the police station. . . .

[After Fisher waived his rights, a] detective asked [Fisher] a series of questions regarding whether he had informed his stepmother and stepbrother that he had killed the victim. In response, [Fisher] laid his head on the table and said, "I'm a mother f-----g murderer and they said I did it." . . .

Prior to [Fisher's] preliminary hearing, Wodarski, an eyewitness, and Burse, the surviving victim, were shown a photographic array of suspects matching their descriptions of the assailant. Both identified [Fisher] as the man responsible for the shooting. . . .  During [a traditional] line-up, both Wodarski and Burse again identified [Fisher] as the shooter without hesitation. . . .

At trial, Rico Gonzalez[7] and Wodarski identified Fisher as the assailant. When cross-examined, both admitted that they had used illegal drugs in the days or hours preceding the murder, but denied that it affected their ability to accurately recall the event. Burse testified that it was [Fisher] who had shot him, and that he

---

[7] Gonzalez testified that a light-skinned black man pushed his way into the building. Gonzalez, however, did not positively identify Fisher at trial.  Gonzalez testified that the rifle found at the scene looked like the one the man who pushed his way into the building was holding.  N.T. 11/8/99 at 55-57.

had ample opportunity to view his attacker when the two had struggled for the gun. Upon vigorous cross-examination, Burse also denied that his drug use affected his recollection and attributed the inconsistencies in his statements to police to the shock he was experiencing after witnessing the murder.

[Fisher's] stepmother and stepbrother next testified that [Fisher] had admitted his involvement in the crime to them. Furthermore, Nyquallah Bey and Genoa Tillman provided evidence of their part in [Fisher's] flight from the police. . . . Bey [then] testif[ied] that, during a telephone conversation several months after the shooting, [Fisher] had told her that he had shot Neal because Neal had "burnt" him in a drug deal. . .  A forensic pathologist testified that Neal had died as a result of a gunshot wound to the chest. Finally, the police officers testified as to the statements [Fisher] made during his transport to the police station and his interrogation.

Commonwealth v. Fisher, 769 A.2d 1116, 1119-22 (Pa. 2001).  In addition to the Pennsylvania

Supreme Court's summary of the evidence, the following specific evidence was introduced at

trial: (1) Nyquallah Bey testified that when Fisher called in the early morning of July 18, 1998,

he said he had just shot someone, and he later said he regretted the shooting, N.T. 11/8/99 at 228,

263; (2) Tillman testified that in October, 1998, Fisher told her he got into a fight with two men

and the gun went off twice, N.T. 11/9/99 at 319; (3) Fisher's stepmother, Shirley Thomas,

testified that when Fisher came home in the early morning of July 18, 1998, he said he shot and

killed someone, N.T. 11/9/99 at 372-73; (4) Fisher told Derrick Thomas he had "robbed the

place," had dropped the gun that he had brought with him, and that the police would be looking

for him, N.T. 11/9/99 at 343-48; (5) Derrick Thomas testified that on the day of the murder

Fisher came home at day break, had what looked like a lot of money bunched up in his hand, was

rushing to get out of the house, and left quickly, N.T. 11/9/99 at 339-41; (6) at around 5 a.m. on

July 18, 1998, Fisher called Tillman and asked her to pick him up, N.T. 11/9/99 at 312-14; (7)

Khalik Benjamin, who had lived with Fisher prior to the murder, identified the rifle that was

recovered from the murder scene as Fisher's rifle that Fisher previously kept on the top shelf of a

closet, N.T. 11/11/99 at 783-84; (8) the parties stipulated that the rifle found on the scene was in

working order and would not discharge if dropped on the ground, N.T. 11/11/99 at 785-86; and

(9) the bullet removed from Burse and two of the bullets removed from Neal were conclusively

found to have been fired from the rifle, N.T. 11/11/99 at 785-86.

      As a result of this overwhelming evidence, the state court reasonably concluded Fisher

was not prejudiced under <u>Strickland</u> by counsel's failure to present evidence to support the theory

that someone else was involved in Neal's murder.

2.    <u>Concession of guilt and admission of unkept promise during<br>closing argument</u>

      Fisher contends trial counsel was ineffective by leaving Fisher defenseless during closing

argument by conceding guilt.  Because the Superior Court's decision was a reasonable

application of <u>Strickland</u>, Fisher's federal claim fails.

      Trial counsel stated the following during closing argument:

> You will recall that on Monday morning I had spoken to you generally about three
> issues. . . I told you that these issues will be present throughout the trial.  They
> will always be relevant and always important. . . .

> Indeed, it appears the evidence bears out that my client, John Fisher, was in the
> room and was involved with Quentin Neal's ultimate demise.

N.T. 11/12/99 at 884-85.  Counsel, however, next argued that reasonable doubt and credibility

were still major issues in the case.  Counsel continued:  "Logically speaking, now that we have

conceded that the evidence supports that my client, John Fisher, was involved, it is now

incumbent upon you to decide to what extent and under what circumstances he was involved."

N.T. 11/12/99 at 885.

      The Superior Court found trial counsel did not concede Fisher's guilt regarding first-

degree murder.  <u>Fisher</u>, No. 2680 EDA 2004, slip op. at 16.  Instead, the court reasoned that

although counsel's statement conceded Fisher was involved with Neal's death, counsel's

18

remaining argument was a plea for a conviction of a lesser degree of murder.  Id.  Moreover, the court reasoned, counsel's strategy, given the great weight of the evidence indicating Fisher was involved, was not deficient.  Id. at 17.  Thus, the court rejected Fisher's claim.  Id.

The Superior Court's decision was neither contrary to nor an unreasonable application of Strickland.  The Superior Court correctly found trial counsel did not concede Fisher's guilt to the charge of first-degree murder; rather, faced with overwhelming evidence, counsel preserved credibility with the jury by admitting Fisher was present when Neal was killed.  Moreover, the jury's more than four hours of deliberations, combined with the verdict, which was not guilty on both the attempted murder charge and the charge of robbery of Neal, shows the jurors carefully weighed the evidence in light of counsel's arguments.  See N.T. 11/12/99 at 1026.  Had Fisher's trial counsel continued to argue Fisher was not involved or present when Neal was killed, the jury likely would have rejected counsel's entire argument as disingenuous.  Federal habeas proceedings are not the place to second-guess trial counsel's reasonable actions.  Strickland, 466 U.S. at 689.

Contrary to Fisher's contention, counsel did not leave him defenseless.  Counsel did, as the prosecutor astutely noted, N.T. 11/12/99 at 938, argue that the jury should consider a lesser degree of murder.  Although Fisher argues counsel's concession that voluntary manslaughter and conspiracy were inapplicable removed any ground for the jury to find reasonable doubt, counsel's argument left open the possibility of a conviction for a lesser degree of murder.[8]  Therefore, the

---

[8] The jury was instructed on each of the three degrees of murder, and could have returned a verdict on second or third-degree murder.  See, e.g., N.T. 11/12/99 at 983; see also Commonwealth v. Bennett, ___ A.2d ___, 2007 WL 2403268 at *13 (Pa. Aug. 23, 2007) (Saylor, J., dissenting) (citing James A. Strazella, The Lesser Included Offense Doctrine and the Constitution: The Development of Due Process and Double Jeopardy Remedies, 79 Marq. L. Rev. 1, 183-89 (1995)).

Superior Court's reasonably applied <u>Strickland</u> in finding Fisher's trial counsel's closing argument was not deficient.

Even if trial counsel's argument had been deficient, Fisher cannot establish a reasonable probability that his trial would have been different.  The evidence against Fisher was prodigious, for example: (1) Fisher told four people that he had shot someone; (2) Wodarski and Burse identified Fisher as the man who rushed into the "crack crib," and Burse identified Fisher as the man who shot him; (3) Khalik Benjamin testified the gun found at the scene was Fisher's gun, and a stipulation identified that weapon as firing the fatal shots; (4) Thomas, Bey, and Tillman testified about Fisher's flight from Norristown immediately after the shooting; (5) Fisher assumed an alias to avoid detection; and (6) after being apprehended, Fisher said he was glad the ordeal was over, and that he was tired of looking over his shoulder.

> 3.   <u>Trial counsel's misunderstanding of the law regarding the limited use of unsworn prior inconsistent statements</u>

Fisher contends trial counsel was ineffective because counsel argued that the jury should consider Burse's prior inconsistent statement as substantive evidence of what occurred the night of the murder, even though the statement was admitted only for impeachment.  Fisher relies on the following statement by counsel:

> Considering Mr. Burse's statement given to Officer Bailey that they were in a struggle and a fight and then he turned around and shot my cousin because he thought he was going to get jumped from behind raised doubt as to whether or not it was an intentional killing. . . .

> Is that so improbable?  Is there premeditation there?  Is there a motive to kill there?  That's just one possible scenario, and based on the evidence a very likely scenario based on what Matthew Burse told Officer Bailey and what he told Dr. Hayes.

N.T. 11/12/99 at 907, 910.  Fisher contends trial counsel's misapprehension of the law was

revealed to the jury when the trial court instructed the jury on the proper use of unsworn prior

inconsistent statements.  See N.T. 11/12/99 at 957-58.

> The Superior Court found trial counsel had not misapprehended the law:
>
>> Viewed in the context with the remainder of trial counsel's argument, it is clear
>> that trial counsel's statement was a development of his argument that Burse's
>> testimony was incredible. . .  Accordingly, it is clear that trial counsel merely
>> argued that Burse's eyewitness testimony was unreliable, and therefore, the jury
>> could not infer [Fisher's] intent from Burse's description at trial of [Fisher's]
>> actions.  Therefore, [Fisher's] argument fails.

Fisher, No. 2680 EDA 2004, slip op. at 18.

The Superior Court's decision was neither contrary to, nor an unreasonable application of

Strickland.  Thus, Fisher's claim is without merit.  When counsel's closing argument is

considered in its entirety, it is clear counsel attempted to discredit Burse's testimony with

reference to Burse's prior inconsistent statement.  The recurring themes of counsel's closing were

credibility and reasonable doubt.  An attack on Burse's credibility with his discordant statements

supported this theme.  See, e.g., N.T. 11/12/99 at 886-94, 901-04, 908.  Moreover, Fisher's trial

counsel attempted to plant the seeds of reasonable doubt in the jurors' minds when he stressed

certain points in the Commonwealth's evidence and argued how the evidence could support more

than one version of events.  See, e.g., id. at 897, 899.  Incumbent in counsel's argument was the

use of Burse's prior inconsistent statement to discredit his testimony.  Thus, the state court

reasonably concluded trial counsel's performance was not deficient.  Even if counsel's

performance had been deficient, Fished cannot show he suffered prejudice based on the

Commonwealth's overwhelming evidence.

> 4.    Trial counsel's misunderstanding regarding the elements of murder

Fisher next alleges trial counsel was ineffective because he argued Fisher was not guilty of first-degree murder based on the Commonwealth's failure to prove motive beyond a reasonable doubt.  Fisher contends counsel was deficient because motive is not a required element of first-degree murder.  Fisher's claim is without merit because he has failed to show the Superior Court's decision was objectively unreasonable.

Although motive is not a required element of first-degree murder, Pennsylvania law provides that motive is one way to prove premeditation, which is a required element of the charge.  See, e.g., Commonwealth v. Edwards, 903 A.2d 1139, 1158 (Pa. 2006). To support his contention, Fisher relies on the following statement made by counsel:

> Now most importantly . . . Jonathan Fisher is not guilty . . . of first degree murder, and I'm going to tell you why.  There is no evidence, or again, at best, very weak evidence that has been presented this week supporting a motive.  This has to be proven beyond a reasonable doubt.

N.T. 11/12/99 at 907-08.  Earlier in the closing argument, however, Fisher's counsel correctly explained the relevance of motive in the case:

> You will recall that I told you that the usual method to prove premeditation is that the defendant had a motive to kill the decedent.  I said that the Commonwealth cannot prove that John Fisher had a motive to take Mr. Neal's life because on that issue of motive you will hear either no evidence or you will hear evidence that is very weak at best. . .

N.T. 11/12/99 at 896.  The state court reasonably applied Strickland in concluding trial counsel's understanding was correct.  Cf. Edwards, 903 A.2d at 1158 (motive evidence relevant to prove deliberation and premeditation); Commonwealth v. May, 887 A.2d 750, 757 (Pa. 2005) (court found substantial evidence of motive and premeditation supported conviction for first-degree murder); Commonwealth v. Collins, 702 A.2d 540, 543 (Pa. 1997) ("Additional evidence of premeditation could be found in . . . Appellant's explanation . . . of his motive for killing

[victim]."); 18 Pa. Cons. Stat. Ann. § 2502(d) (premeditation is an element of an intentional killing).

After a lengthy discussion of motive, to solidify his logic in the minds of the jurors Fisher's trial counsel stated:  "On this narrow issue, yet very important critical issue, the prosecution cannot prove a motive.  They cannot, therefore, prove beyond a reasonable doubt premeditation.  They cannot, therefore, prove beyond a reasonable doubt first degree murder."  N.T. 11/12/99 at 900-01.  Fisher's contention that counsel's later statement that motive must be proven beyond a reasonable doubt misconstrues counsel's argument.  When taken in the context of the entire closing argument, the state court reasonably applied Strickland in determining counsel did not misapprehend the law; counsel merely reiterated his argument on motive without rehashing the complete argument.

Fisher further contends trial counsel's misapprehension of the law was highlighted by the trial court's instruction: "Motive is not part of the elements of the crimes, and the Commonwealth is not required to prove a motive for the commission of the various crimes charged here."  N.T. 11/12/99 at 992.  The trial court, however, continued: "This does not mean, however, that you would reject without any thought or discussion any evidence concerning motive.  Knowledge of human nature tells us that an ordinary person is more likely to commit a crime if he has a motive than if he has none. . ."  Id. at 992-93.

In rejecting Fisher's claim, the Superior Court reasoned:

As we have held numerous times, proof of motive, while relevant, is not an essential element of any crime, and the Commonwealth need not prove motive to obtain a conviction for a particular crime.  A review of trial counsel's entire argument indicates that his discussion of motive was relegated to the Commonwealth's general use of motive evidence as a means to prove premeditation, which is an essential element of first-degree murder.  Trial counsel argued that the Commonwealth could not show that [Fisher] acted with premeditation in the killing of Quentin Neal because the Commonwealth could

23

not show that [Fisher] had a motive to kill Quentin Neal.  Therefore, trial counsel's closing argument to the jury was not improper.  As such, [Fisher's] argument is without arguable merit.

Fisher, No. 2680 EDA 2004, slip op. at 18-19 (internal citation omitted).

Fisher's claim is without merit because the Superior Court's decision was neither contrary to, nor an unreasonable application of Strickland.[9]  To prevail on his claim under Strickland, Fisher must show counsel was deficient, and his deficiencies prejudiced Fisher.  As the foregoing demonstrates, counsel was not deficient in arguing the Commonwealth did not prove motive.  Although motive is not an element of first-degree murder, both the Superior Court and the trial court adroitly noted motive is relevant to show a required element of the crime: premeditation.  Counsel was faced with a plethora of evidence implicating Fisher in Neal's death.  Thus, counsel's attempt to highlight a weakness in the Commonwealth's case was not deficient performance.[10]  Instead, the state court reasonably found counsel's continued attempt to solidify reasonable doubt in the minds of the jurors by arguing Fisher had no motive to kill Neal - - and thus, was not guilty of first-degree murder - - was competent advocacy.

5.   Trial counsel's failure to investigate and present readily available impeachment evidence

---

[9] Fisher's claim would also fail under a de novo evaluation of the merits.  Fisher cannot show his counsel's performance fell below professional norms because the entire record shows counsel did not misapprehend the law.

[10] The Commonwealth's evidence and argument emphasized the relevance of motive.  Although the prosecutor correctly noted that motive is not an essential element, he spent time rebutting counsel's motive argument by stating: "[Motive is] relevant to show you why somebody would do something. . . .  I suggest to you that motive in this case was proven."  N.T. 11/12/99 at 943.  The prosecutor then recounted the testimony of Mamie and Nyquallah Bey, which he argued showed Fisher had a motive to kill Quentin Neal.  Id. at 944-47.

Fisher contends trial counsel was ineffective in failing to investigate and present impeachment evidence regarding Matthew Burse and Derrick Thomas.  Fisher supports his contention by recounting the evidence trial counsel could have used to impeach Burse and Thomas.  Moreover, during Thomas' cross-examination the prosecutor and Fisher's trial counsel had an off-the-record conversation when trial counsel began questioning Thomas about his aliases.  See N.T. 11/9/99 at 349.   After the conversation between counsel, Fisher's trial counsel allowed the prosecutor to question Thomas about his deal with the Commonwealth.  After recounting the fairly lengthy criminal records of Burse and Thomas in his memorandum, Fisher alleges trial counsel was ineffective for failing to investigate such readily available impeachment evidence.

Fisher also claims he suffered prejudice because had trial counsel been effective the jury would have "learned that not only did Burse have motivation to testify - - leniency in his upcoming sentencing - - he and Thomas also had a history of using an alias, lying under oath and failing to appear in court."  Pet'r's Mem. at 34.  The jury, however, was presented with almost all of this evidence, and any evidence it did not hear would have been cumulative.  See, e.g., United States v. Walton, 2007 WL 2108118 at *9 (E.D. Pa. July 20, 2007) (DuBois, J.) (cumulative impeachment evidence not material under Brady) (citing United States v. Zimmerman, 2001 WL 706256 at *5 (E.D. Pa. Jun. 21, 2001) (Yohn, J.)); see also Youngblood v. West Virginia, 126 S. Ct. 2188, 2190 (2006) (must be a reasonable probability that result would have been different if impeachment evidence was introduced at trial).

As the Superior Court correctly noted, Thomas' use of aliases was elicited on cross-examination.  See Fisher, No. 2680 EDA 2004, slip op. at 20 (citing N.T. 11/9/99 at 349).  Fisher now claims trial counsel's decision to allow the prosecutor to reopen his direct to elicit

impeachment evidence was ineffective.  However, it is not certain this weakened Fisher's

defense.  Fisher's counsel began[11] his cross-examination by revealing Thomas had used many

aliases in the past.  The prosecutor then, with counsel's permission, interjected and reopened his

direct examination.  This action could have caused the impeachment evidence to be more

memorable to the jury because the prosecutor was compelled to highlight it through his

interjection.

The Superior Court reasonably applied Strickland in finding Thomas' favorable treatment

by the Commonwealth was presented to the jury.  Id.; see also N.T. 11/9/99 at 350-56.

Specifically, the jury was told:  (1) Thomas received one year of probation on a drug charge in

exchange for his testimony in Fisher's trial; (2) Thomas was arrested several times for failing to

pay fines, which ultimately led to his spending a short time in jail; (3) on one occasion Thomas

was found with marijuana when he was arrested on a warrant for failing to pay fines, but with the

help of the detectives in Fisher's case, Thomas was not found in violation of his probation; and

(4) the detectives in Fisher's case resolved an issue with an incorrect address Thomas had given

to Philadelphia authorities during a 1995 arrest, which led to Thomas awaiting trial on the charge

at the time of Fisher's trial.  N.T. 11/9/99 at 350-56.  Moreover, the Superior Court found

Thomas had not been convicted of forgery at the time of Fisher's trial, and thus, could not have

been impeached with the evidence.  See Fisher, No. 2680 EDA 2004, slip op. at 20 (citing Pa. R.

Evid. 607(a) (prior conviction for crimes involving false statements qualify as impeachment

---

[11] See Steven Lubet, Modern Trial Advocacy: Analysis and Practice 16 (3d ed. 2004)
(primacy is a basic tenet of advocacy that provides important evidence should be elicited at
beginning of testimony).

evidence)).  Thomas eventually pleaded guilty to one count of forgery on July 10, 2000.[12]  See Mont. Co. Ct.  Com. Pl. Docket No. CP-46-CR-0000930-1999.

Likewise, much of the evidence with the potential to impeach Burse was introduced at trial.  On direct examination Burse testified he and Neal had a drug-selling operation out of the room where Neal was killed, which included someone usually posted at the front door to watch for police and other people, "runners", who escorted buyers from the street.  N.T. 11/8/99 at 132-134, 157-58.  Burse testified he had been convicted of dealing drugs in 1999, which resulted in four to 24 months incarceration.  N.T. 11/8/99 at 134-35.  After being released, Burse was again arrested for dealing drugs.  At the time of Fisher's trial, Burse had pleaded guilty, with no promise of leniency from the Commonwealth, and was awaiting sentencing.  Id.  During cross-examination Fisher's counsel explored the nature of Burse's guilty plea, and Burse testified he had no specific agreement with the Commonwealth, but that "I'm here to try to get the defendant convicted.  I mean, he shot me and killed my cousin."  N.T. 11/8/99 at 141-44.

Fisher claims Burse's sentencing transcript shows Burse was given consideration for his testimony.  At Burse's sentencing, however, the prosecutor reiterated that the Commonwealth had no recommendation as to Burse's sentence.  See Commonwealth v. Burse, N.T. 1/20/2000 at 8-9.  Moreover, Burse's sentencing occurred after Fisher's trial.

The Superior Court found Fisher was not prejudiced by trial counsel's failure to attack Burse's credibility using readily available impeachment evidence:

> Although it is true that trial counsel could have attacked Burse's credibility by eliciting testimony regarding [the alleged readily available impeachment evidence], the record indicates trial counsel attacked Burse's credibility via cross-

---

[12] This fact should have been clear after the Superior Court's decision, and is available by examining Pennsylvania's Unified Judicial System at http://ujsportal.pacourts.us/WebDocketSheets/WebDocketSheets.aspx.

> examination regarding his plea of guilty to drug charges and the possibility of
> favorable treatment as a result of his testimony, as well as cross-examination
> about his drug-selling enterprise.  Thus, Burse's credibility was already in
> question before the jury, and, as such, trial counsel's failure to elicit further
> cumulative impeachment evidence was not so prejudicial as to render the verdict
> unreliable.

Fisher, No. 2680 EDA 2004, slip op. at 19-20 (citing Commonwealth v. Thuy, 623 A.2d 327,

332-333 (Pa. Super. 1993)).

Given the mountain of evidence implicating Fisher in Neal's killing, which has been

previously detailed, counsel's failures, if any, did not prejudice Fisher.  The Superior Court's

decision regarding the potential impeachment evidence for Burse and Thomas is, therefore,

neither contrary to, nor an unreasonable application of Strickland.

Even assuming the potential impeachment evidence would have caused the jury to

discredit Burse's and Thomas' testimony in whole or part, confidence in the outcome of the trial

is unchanged because of the remaining multitude of evidence that supported Fisher's conviction.

Fisher told three people other than Thomas that he had shot someone.  Moreover, Wodarski also

identified Fisher as the man who rushed into the "crack crib."  Khalik Benjamin testified the gun

found at the scene was Fisher's gun, and the stipulation identified that weapon as firing the fatal

shots.  Bey and Tillman testified about Fisher's flight from Norristown immediately after the

shooting.  Once in New Jersey, Fisher assumed an alias to avoid detection.  Finally, after being

apprehended, Fisher said he was glad the ordeal was over and was tired of looking over his

shoulder.

The overwhelming evidence of Fisher's guilt forecloses any possibility that Fisher was

prejudiced by any failure to impeach Burse and Thomas.  Thus, Fisher's claim fails.[13]

---

[13] Each of Fisher's reviewable ineffective assistance of counsel claims would fail even

(continued...)

B.    <u>The Commonwealth failed to turn over impeachment evidence concerning Matthew Burse and Derrick Thomas</u>

Fisher alleges the Commonwealth violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), when it failed to disclose favorable impeachment evidence regarding Burse and Thomas.  This evidence, Fisher alleges, would have enlightened the jury about each witnesses' criminal convictions involving dishonesty.  This claim is without merit because the state court's application of <u>Strickland</u> was not objectively unreasonable.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  <u>Brady</u>, 373 U.S. at 87.  A <u>Brady</u> violation has three essential components: "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [s]tate, either willfully or inadvertently; and prejudice must have ensued."  <u>Strickler v. Greene</u>, 527 U.S. 263, 281 (1999); <u>see also</u> <u>United States v. Risha</u>, 445 F.3d 298, 303 (3d Cir. 2006).

The duty to disclose such evidence encompasses impeachment evidence as well as exculpatory evidence.  <u>Strickler</u>, 527 U.S. at 280.  "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule."  <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972).

The undisclosed "evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different . .

---

(...continued)

under de novo review.  In light of the overwhelming evidence, Fisher cannot meet <u>Strickland</u>'s prejudice prong.  Moreover, Fisher was not denied effective assistance of counsel even if all of the alleged errors are considered together.

. although a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Youngblood, 126 S. Ct. at 2190 (quoting Strickler at 280; Kyles v. Whitley, 514 U.S. 419, 435 (1995)).  Although "the duty is triggered by the potential impact of favorable but undisclosed evidence," Kyles, 514 U.S. at 434, the Constitution is not violated every time the government fails to disclose evidence that might prove helpful to the defense.  Smith v. Holtz, 210 F.3d 186, 196 (3d Cir. 2000); see also United States v. Agurs, 427 U.S. 97, 109-110 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.").  Rather, the failure to disclose rises to the level of a due process violation only if the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the outcome of the trial.  Smith, 210 F.3d at 196 (quoting Kyles, 514 U.S. at 434); Youngblood, 126 S. Ct. at 2190.  "The question is not whether the defendant would more likely than not have received a different verdict with the [concealed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  Kyles, 514 U.S. at 434.

A reversal is not required if "a combing of the prosecutors' files" after the trial discloses evidence that possibly was useful to the defense but not likely to have changed the verdict. Giglio, 405 U.S. at 154.  Brady also does not require the prosecutor to provide a defendant with information which he already has or with any reasonable diligence, he can obtain himself. United States v. Pelullo, 399 F.3d 197, 213 (3d Cir. 2005); Gov't of Virgin Islands v. Martinez, 780 F.2d 302, 318 (3d Cir. 1985); United States v. Starusko, 729 F.2d 256, 262 (3d Cir. 1985). "Evidence is not considered to be suppressed if the defendant either knew or should have known

of the essential facts permitting him to take advantage of any exculpatory evidence." <u>United States v. Perdomo</u>, 929 F.2d 967, 973 (3d Cir. 1991) (citing <u>United States v. Torres</u>, 719 F.2d 549 (2d Cir. 1983)).

Fisher's memorandum of law succinctly explains why his <u>Brady</u> claim fails:

> All counsel had to do was go to the Montgomery County Clerk of Court - - in the same courthouse where Petitioner's trial took place - - and ask for a copy of the respective court files on Burse and Thomas.  This would have led to the impeachment evidence outlined above [in the prior section alleging a <u>Brady</u> violation] and would have provided counsel with pointed questions for both Burse and Thomas. . .

Pet'r's Mem. at 33; <u>see also</u> <u>Pelullo</u>, 399 F.3d at 213; <u>Perdomo</u>, 929 F.2d at 973.  The Commonwealth did not violate <u>Brady</u> because the evidence was readily available for Fisher's use had reasonable diligence been undertaken, and thus, readily available evidence was not "suppressed" in a way to trigger <u>Brady</u>.

In denying Fisher's <u>Brady</u> claim, the Superior Court found:

> Inasmuch as we have already concluded that the outcome of the proceedings would not have been different had evidence of Burse's use of an alias been presented to the jury, [Fisher's] claim lacks arguable merit.  Further, as stated above, the jury was aware that Thomas had used aliases previously.  Even if the Commonwealth failed to provide [Fisher] of Thomas' forgery arrest, such evidence could not have been presented to the jury for impeachment purposes. Accordingly, [Fisher's] argument fails.

<u>Fisher</u>, No. 2680 EDA 2004, slip op. at 21-22 (citing Pa. R. Evid. 607(a)).  In light of Fisher's concession that the impeachment evidence was readily available, and the cumulative nature of the impeachment material, as detailed above in the discussion of trial counsel's failure to investigate and present the evidence, the Superior Court's decision is neither an unreasonable application of <u>Brady</u> nor contrary to federal law.[14]  <u>See, e.g.</u>, <u>Walton</u>, 2007 WL 2108118 at *9

---

[14] To the extent Fisher challenges counsel's ineffective assistance for failing to challenge
(continued...)

(cumulative impeachment evidence not material under <u>Brady</u>) (citing <u>Zimmerman</u>, 2001 WL 706256 at *5); <u>see also</u> <u>Youngblood</u>, 126 S. Ct. at 2190 (must be a reasonable probability that result would have been different if impeachment evidence was introduced at trial).

> C.   <u>Sixth, Eighth, and Fourteenth Amendment violations due to pervasive prosecutorial misconduct</u>[15]

Fisher alleges the Commonwealth engaged in pervasive prosecutorial misconduct at trial. Fisher claims the Commonwealth improperly elicited the testimony of several witnesses through reductions in fines and dismissal of charges.  Moreover, Fisher alleges the prosecutor's opening statement and closing argument contained improper remarks.  Fisher's claim is without merit.

When analyzing claims of prosecutorial misconduct, the Supreme Court has emphasized the crucial inquiry is the fairness of the trial, not the culpability of the prosecutor.  See <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982); <u>see also</u> <u>Marshall</u>, 307 F.3d at 58-59.  Several factors should be examined:  the context within which the prosecutor's misconduct occurred, whether the trial court issued curative instructions after the prosecutor's misconduct, and whether the case against the defendant was strong.  See <u>Greer v. Miller</u>, 483 U.S. 756, 765-66 (1987); <u>Darden v. Wainwright</u>, 477 U.S. 168, 182 (1986); <u>Moore v. Morton</u>, 255 F.3d 95, 107 (3d Cir. 2001).  If the

---

(...continued)

the Commonwealth's alleged failure to provide impeachment evidence in accordance with <u>Brady</u>, this claim fails.  Fisher failed to show a <u>Brady</u> violation occurred, and thus, cannot show counsel was ineffective for failing to challenge the Commonwealth on this basis.

[15] Fisher's counseled memorandum of law does not cite federal law or Supreme Court precedent to support his claim - - other than general mention of certain constitutional Amendments.  Nor does the memorandum attempt to explain the defects in the Superior Court's decision.  My careful review reveals no constitutional error.

evidence against the defendant is strong, it is less likely the prosecutor's misconduct influenced the jury's decision to convict.  See Darden, 477 U.S. at 182.

In assessing whether prosecutorial misconduct has deprived defendant of a fair trial, "the process of constitutional line drawing . . . is necessarily imprecise."  Moore, 255 F.3d at 107 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 645 (1974)).  In the context of the trial as a whole, closing argument misconduct must "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process."  Moore, 255 F.3d at 105 (quoting Donnelly, 416 U.S. at 643).  The prosecutor's conduct must constitute a "failure to observe that fundamental fairness essential to the very concept of justice."  Id.  Even closing argument that merits condemnation does not constitute a due process violation unless there is a strong likelihood the jury's decision was influenced by the improper argument.  Darden, 477 U.S. at 182.  Moreover, the jury is presumed to follow a curative instruction.  Greer, 483 U.S. at 766 n.8.

Strong evidence, combined with curative instructions, normally is sufficient to preclude prosecutorial misconduct from depriving a defendant of due process.  Moore, 255 F.3d at 107, 111, 113; Marshall, 307 F.3d at 50 (strong evidence makes it more unlikely that improper arguments rendered the trial unfair).

Fisher explicitly challenges two statements made by the prosecutor, and also challenges the tactics the Commonwealth employed to secure witnesses' testimony.[16]  First, during his opening statement, the prosecutor repeated a portion of a statement given by Fisher: "I'm a

---

[16]  Fisher also makes the blanket assertion that: "The prosecutor directly impugned defense counsel, and accused him of deliberately attempting to mislead the jury."  Pet'r's Mem. at 37.  Fisher, however, did not cite where the prosecutor's alleged misconduct can be found. After thoroughly reviewing the trial transcript I cannot find any comments that would entitle Fisher to a new trial.  As the Superior Court aptly noted, the prosecutor's statements concerning the defense misleading the jury were aimed to discredit counsel's argument, not counsel himself. See Fisher, No. 2680 EDA 2004, slip op. at 24.

motherf---ing murderer and they said I did this." N.T. 11/8/99 at 18. Fisher contends this

reference to the statement improperly signaled to the jury that Fisher's guilt was conceded.

Second, during closing argument, the prosecutor asked the jury to return a guilty verdict, capping

his argument with the following: "All that is required for evil to triumph over good is for good

people to sit back and do nothing. Don't let that happen." N.T. 11/12/99 at 947. Third, Fisher

contends the Commonwealth employed unscrupulous tactics of having fines and charges dropped

against Commonwealth witnesses Thomas and Wodarski.

     The Superior Court's decision denying Fisher's claims of prosecutorial misconduct and

denial of a fair trial was neither contrary to Supreme Court precedent, or an unreasonable

application of precedent.

     The Superior Court rejected Fisher's claim that the Commonwealth's used improper

tactics to secure testimony:

> It is true that a prosecutor defrauds the court where the prosecutor takes steps to
> conceal deals made with Commonwealth witnesses for leniency in sentencing in
> order to limit defense impeachment of those witnesses. However, in the present
> case, Thomas and Wodarski testified about the consideration that the
> Commonwealth gave them prior to trial for their favorable testimony. Further,
> trial counsel cross-examined these witnesses regarding these points. Lastly,
> [Fisher] provided no evidence at the PCRA hearing that the Commonwealth
> entered into secret deals with these witnesses for favorable sentences after the
> completion of [Fisher's] trial. Accordingly, [Fisher's] argument fails.

Fisher, No. 2680 EDA 2004, slip op. at 23 (internal citation omitted).

     Moreover, in denying Fisher's claim challenging the prosecutor's statement about good

and evil, the Superior Court identified the correct legal standard - - that the prosecutor's remarks

must have the unavoidable effect of prejudicing the jury - - and then found the statement did not

deprive Fisher of a fair trial:

> This statement, while arguably intemperate, was not inflammatory to such a
> degree that it would fix bias and hostility against [Fisher] in the minds of the jury.

> The statement was not a direct indictment of [Fisher's] moral character, and it was made in isolation at the close of a week-long trial. As such, [Fisher] cannot demonstrate prejudice accruing to him from this statement. Therefore, [Fisher's] argument fails.

Fisher, No. 2680 EDA 2004, slip op. at 24.

The statements and actions of Commonwealth that Fisher claims constitute pervasive prosecutorial misconduct do not rise to the level of affecting the fundamental fairness of his trial. The Superior Court reasonably applied Supreme Court precedent in finding the prosecutor's statement concerning good and evil was isolated, did not impugn Fisher's moral character, and was not so inflammatory to fix bias against Fisher.

Likewise, the state court reasonably determined the Commonwealth's tactics in securing certain witnesses' testimony did not render Fisher's trial unfair. First, Fisher did not identify any deals with the witnesses that were not revealed at trial. Instead, Fisher supports his claim by citing the witnesses' testimony where their dealings with the Commonwealth were revealed. Fisher's trial counsel had ample opportunity to cross-examine the witnesses to challenge the veracity of their testimony. Fisher cites no legal authority to demonstrate his rights are violated when the prosecution secured the testimony of witnesses through leniency, and revealed the leniency at trial. Nor does Fisher cite any evidence of secret deals of leniency.

Although the Superior Court did not address the prosecutor's statement during opening that Fisher contends was intended to signal that Fishers' guilt was a forgone conclusion, the claim fails even under de novo review. The prosecutor was entitled to repeat Fisher's admission, whether it was an admission of guilt or an admission of disbelief. Moreover, the prosecutor provided the jury with the statement's context: "This man's words when he got caught nine or ten months after this incident occurred when he found out that his own family members had told the police what he had done." N.T. 11/8/99 at 18. Even if the use of Fisher's statement had any

35

tendency to signal to the jury that Fisher's guilt was conceded, it was quickly corrected when the prosecutor continued his opening statement to spend 17 transcript pages outlining the facts that proved Fisher's guilt.  Moreover, Fisher's counsel then opened to the jury and outlined the defenses that showed Fisher was not guilty.  Thus, the prosecutor's presentation of Fisher's statement - - and the context in which it was made - -  to the jury was not improper, and did not violate any of Fisher's rights because it in no way constituted a failure to observe fundamental fairness and did not deny Fisher a fair trial.  See Moore, 255 F.3d at 105.

Taken together, the alleged prosecutorial misconduct did not render Fisher's trial unfair because the evidence against Fisher was overwhelming, and the misconduct cited by Fisher, as the foregoing demonstrated, was not pervasive, if indeed misconduct.  Marshall, 307 at 50. Thus, Fisher's claim fails.

### D.    Cumulative Error

Fisher's final contention is that even if none of his claimed errors warrant relief, he is entitled to relief because the cumulative effect of the errors undermined the fairness of his trial. See, e.g., Kyles, 514 U.S. at 437-38.  "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'" Albrecht, 485 F.3d at 138-39 (citing Brecht, 507 U.S. at 637).  Because of the strength of the Commonwealth's case against Fisher, Fisher cannot show actual prejudice, i.e., that the verdict was unreliable, and thus, his claim fails.  See Alexander v. Shannon, 163 Fed. Appx. 167, 176 (3d Cir. 2006).

Having determined the foregoing, I make the following:


## **RECOMMENDATION**


AND NOW, this 6th day of September, 2007, it is respectfully recommended that the petition for a writ of habeas corpus be DENIED with prejudice.  It is also recommended that a certificate of appealability not be granted.

BY THE COURT:


 /s/ Timothy R. Rice
TIMOTHY R. RICE
U.S. MAGISTRATE JUDGE